(58 Misc. Rep. 401.)

### FIFTH AVENUE COACH CO. v. CITY OF NEW YORK.

(Supreme Court, Special Term, New York County. March, 1908.)

1. MUNICIPAL CORPORATIONS—USE OF STREETS—NUISANCE—WHAT CONSTITUTES —INJUNCTION.

A corporation operating public stages through principal streets of a city, permitting its vehicles to carry advertising signs bearing colors, constituting a disfigurement rather than ornament, but not injuring public comfort, health, or safety, cannot be restrained by injunction from exhibiting such signs on the ground that they constitute a nuisance.

2. CORPORATIONS—SALE OF FRANCHISE AND RIGHTS—EFFECT.

A corporation formed to carry passengers or property for hire in certain vehicles, to keep a livery, and manufacture and deal in harnesses and vehicles and commodities connected with such business, was authorized by law thereafter to operate stages through certain streets in the city of New York. It was thereafter dissolved, and its franchises and rights sold to a natural person, who transferred them to another corporation. Held, that the latter corporation was vested with all the rights, privileges, and franchises of the original corporation.

3. SAME—CORPORATE RIGHTS AND DUTIES.

Where a corporation was organized to carry passengers for hire and to operate stages through the city of New York, the maintaining of ex-

terior advertising signs on its stages is not necessary to the exercise of its corporate powers or its duties, but is an independent enterprise, dissociated from its chartered business, which does not tend to promote the comfort of its passengers or effect any improvement in its traffic facilities.

4. MUNICIPAL CORPORATIONS—USE OF STREETS—ADVERTISING.

The leasing by a corporation authorized to run stages in the city of New York of the exterior of such vehicles for advertising is an unauthorized use of the streets for a private purpose, which will not be approved by the court merely because it is a source of profit to the wrong-doer.

5. SAME—REGULATION BY ORDINANCE.

Greater New York Charter, Laws 1897, p. 21, c. 378, § 50, empowering the aldermen to regulate the use of streets and the exhibition of advertisements or handbills, and to establish ordinances to that end, is sufficient authority for an ordinance prohibiting advertising wagons in the streets, as against a corporation organized to run stages in the city of New York while attempting to exercise unauthorized privileges by renting the exterior of its stages for advertising purposes.

Action by the Fifth Avenue Coach Company against the city of New York for injunction. Complaint dismissed.

See 110 N. Y. Supp. 1037.

Page, Crawford & Tuska (Wm. H. Page, G. H. Crawford, of counsel), for plaintiff.

Francis K. Pendleton, Corp. Counsel (Louis H. Hahlo, of counsel), for defendant.

LEVENTRITT, J. The plaintiff seeks to enjoin municipal interference with the advertising signs displayed on the exterior of its stages, but it fails to establish that clear legal right the existence of which is a condition indispensable to equitable relief. The defendant insists that the signs constitute a public nuisance. Although not bearing upon the ultimate disposition of the controversy, it may not be amiss to discuss this subject as a preliminary to the main questions presented.

Prior to July, 1907, the plaintiff operated along Fifth avenue stages propelled by horse power, and during that month automobile stages were substituted. The latter stages contain an upper deck with transverse seats accommodating 18 passengers. A staircase leads from the body or platform of the stage to the upper deck, which is surrounded by a wire screen, about three feet high, extending around the top of the stage and down the stairway. In May, 1905, the plaintiff entered into an agreement with the Railway Advertising Company whereby it leased to that company the exclusive right to maintain advertising signs on the interior of its stages, coaches, or omnibuses when employed as "public carriers," also the right to maintain four advertising flags on the roofs of the stages "for the purpose of advertising or displaying thereon announcements of events of public interest or amusement calculated to attract passenger travel to the coach company's line." Two of these flags were to be "used by the coach company, as occasion may require, for displaying announcements of public interest" such as did not conflict with the advertising company's rights. The contract provided for the regulation of the size

and character of the signs to be displayed, but prohibited exterior advertising. In May, 1907, a second agreement was entered into by the plaintiff with the Railway Advertising Company granting "the exclusive right and privilege of maintaining advertising signs upon the exterior of each and every coach or omnibus." The plaintiff reserved the right to cancel the agreement upon 30 days' notice, "if at any time any order or judgment of a court having jurisdiction in the premises shall be entered, or any act of the Legislature of the state of New York shall be passed, or any ordinance or resolution of the city of New York or of any branch of the city government shall be adopted which forbids the use of the exterior of said vehicles for advertising purposes." Prior to July, 1907, the advertising signs on the exterior of the plaintiff's stages consisted of the four flags, which were supplemented after May, 1907, by a few small signs on certain of the stages calling attention to points of interest on or near the route. Simultaneously with the substitution of the automobile stages the exterior signs were enlarged. To the sides of each stage were affixed signs 13 feet long and over 2 feet high, extending along and from the floor of the upper deck in an upright position. A sign was placed on the front over the hood, running from one side of the stage to the other. A sign was placed over the hood at the back of the stage. A sign, 8 feet long and about 20 inches high, followed the course of the staircase leading from the platform to the roof. A sign was also placed under the staircase and one on the riser of each of the steps and on the back of each seat on the roof of the stage. These signs advertised in various glaring colors and appropriate legends divers articles —at first "Duke's Mixture Smoking Tobacco," then "Bull Durham Smoking Tobacco," and at the present time and since December, 1907, "Helmar Turkish Cigarettes." The signs now in use will serve to illustrate the general character of the exterior advertising since July, 1907. The signs on the sides of the stage represent a scene in an Eastern country. At the left of the picture is a stone wall painted in a dark color, with the legend "Helmar Turkish Cigarettes" in white with black shading around the letters. The wall is about 4 feet long. The first letter of the word "Helmar" is about 12 inches high and the last about 9 inches. The words "Turkish Cigarettes" appear in smaller letters under the word "Helmar." At the right of the picture are painted the figures of two pack camels and three men in Oriental costumes of various colors. Behind the camels and nearer the extreme right of the picture are columns, and to the right of these appears a package of cigarettes, 20 inches long by 16 inches in width, with the word "Helmar" near the top and the words "Turkish Cigarettes" in smaller letters near the bottom. The picture also contains the head and bust of a woman. The remaining signs carried are of the same general character. The colors used—green, dark blue, white, light blue, yellow, drab, and various brilliant shades of red—are contrasted so as to attract attention, and are not blended so as to produce a harmonious or an artistic effect, and the resulting painting constitutes a disfigurement, rather than an ornament. These signs are not a public nuisance. Under no definition recognized in this state can they be so

held. Offensive to the eye, though they may be, crude, inartistic, and unsightly though they are, they cannot be condemned as a nuisance.

Section 385 of the Penal Code reads as follows:

"A public nuisance is a crime against the order and economy of the state, and consists in unlawfully doing an act, or omitting to perform a duty, which act or omission: (1) Annoys, injures or endangers the comfort, repose, health or safety of any considerable number of persons; or (2) offends public decency; or (3) unlawfully interferes with, obstructs, or tends to obstruct, or renders dangerous for passage, a lake, or a navigable river, bay, stream, canal or basin, or a stream, creek or other body of water which has been dredged or cleared at public expense, or a public park, square, street or highway; or (4) in any way renders a considerable number of persons insecure in life or the use of property."

And section 1229 of the Greater New York charter (Laws 1897, p. 440, c. 378) declares:

"The word 'nuisance,' as used in this act, shall be held to embrace public nuisance, as known at common law or in equity jurisprudence; and it is further enacted that whatever is dangerous to human life or detrimental to health; whatever building or erection, or part or cellar thereof, is overcrowded with occupants, or is not provided with adequate ingress and egress to and from the same, or the apartments thereof, or is not sufficiently supported, ventilated, sewered, drained, cleaned or lighted, in reference to their or its intended or actual use; and whatever renders the air, or human food or drink, unwholesome, are also severally in contemplation of this act, nuisances."

In Wood on Nuisances (3d Ed. § 801, p. 1177) we find this definition:

"In all cases, in order to warrant an injunction for a nuisance resulting from noise, smoke, noisome smells, etc., where there is no serious injury to property, but the application for the injunction is predicated upon the discomfort produced thereby, the discomfort must be shown to be physical, and not such as depends on taste or imagination. It must be offensive physically to the senses, and by such offensiveness as makes life uncomfortable."

In Bohan v. Port Jervis Gaslight Co., 122 N. Y. 18, 32, 25 N. E. 246, 250, 9 L. R. A. 711, the term, "as it is ordinarily understood," defined is:

"That which is offensive and annoys and disturbs. A common or public nuisance is that which affects the people, and is a violation of a public right either by direct encroachment upon public property or by doing some act which tends to a common injury or by the omitting of that which the common good requires, and which it is the duty of a person to do. Public nuisances are founded upon wrongs that arise from the unreasonable, unwarrantable, or unlawful use of property, or from improper, indecent, or unlawful conduct working an obstruction or injury to the public and producing material annoyance, inconvenience, and discomfort. Founded upon a wrong it is indictable and punishable as for a misdemeanor. It is the duty of individuals to observe the rights of the public and to refrain from the doing of that which materially injures and annoys or inconveniences the people, and this extends even to business which would otherwise be lawful, for the public health, safety, convenience, comfort, or morals is of paramount importance, and that which affects or impairs it must give way for the general good."

The advertisements in question cannot be said to injure or endanger comfort, repose, health, or safety. They do not produce any describable physiological effect. At most, they are offensive to the eye and to the æsthetic taste. "It would be a dangerous undertaking," said Mr. Justice Holmes, in Bleistein v. Donaldson Lithographing Co., 188 U. S.

239, 251, 23 Sup. Ct. 298, 300, 47 L. Ed. 460, "for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the narrowest and most obvious limits. At the one extreme some works of genius would be sure to miss appreciation. Their very novelty would make them repulsive until the public had learned the new language in which their author spoke. It may be more than doubted, for instance, whether the etchings of Goya or the paintings of Manet would have been sure of protection when seen for the first time. * * * If they command the interest of any public, they have a commercial value—it would be bold to say that they have not an æsthetic and educational value—and the taste of any public is not to be treated with contempt. It is an ultimate fact for the moment, whatever may be our hopes for a change." It has been held that public æsthetics may be effectuated under the exercise of the right of eminent domain. Attorney General v. Williams, 174 Mass. 476, 55 N. E. 77. But that object cannot be accomplished by legislation through police power without compensation. That power is confined to the protection of public safety, health, and morality. The use of billboards on private property may not be interfered with, no matter how serious a public eyesore may result. People v. Green, 85 App. Div. 400, 83 N. Y. Supp. 460; Bill Posting Sign Co. v. Atlantic City, 71 N. J. Law, 72, 58 Atl. 342; City of Passaic v. Patterson Bill Posting Co., 72 N. J. Law, 285, 62 Atl. 267, 111 Am. St. Rep. 676; City of Chicago v. Gunning System, 214 Ill. 628, 73 N. E. 1035, 70 L. R. A. 230.

Civic pride has prompted the preservation of many streets and other localities against every invasion which would tend to destroy, injure, or detract from their beauty or general artistic appearance. Public æsthetics has dictated the selection and development of parks and the erection and decoration of buildings; natural beauty being the standard for the former and artistic excellence for the latter. And we are not without statutory direction that certain æsthetic features be protected. Section 612, Greater New York Charter. In Tompkins v. Pallas, 47 Misc. Rep. 309, 95 N. Y. Supp. 875, which was an action brought to enjoin the use of a fence inclosing a portion of one of the city parks for billboard advertising purposes, Mr. Justice Scott wrote as follows:

"A public park has been defined by the Court of Appeals as 'a piece of ground inclosed for purposes of pleasure, exercise, amusement, or ornament' (Perrin v. N. Y. C. R. Co., 36 N. Y. 120), and commissioners charged with the care of such parks have often been held justified in granting licenses for the maintenance within parks of such conveniences as would enhance the opportunities of the public to use and enjoy the parks as places of resort, amusement, recreation, and exercise. In every case, however, in which the exercise of this power has been sustained, it has been because the use authorized has in some way contributed to the use and enjoyment of the park by the public. The defendant Pallas gives, in his affidavit opposing this motion, a list of some of the licenses heretofore granted with respect to the city's parks, including restaurants, refreshment stands, boats, stages, boathouses, and flower stands. This very list of itself shows that heretofore the issue of licenses has been limited to objects which would tend to afford additional facilities for the beneficial use and enjoyment of the parks by the public, and have come to be generally recognized as appropriate aids to the full enjoyment of public pleasure grounds. No such claim can be made for the advertisements of which the plaintiff complains. It is too obvious to require demonstration that business

advertisements painted upon a board fence contribute nothing to the beneficial use of the park by the public."

In United States v. Gettysburg El. R. Co., 160 U. S. 668, 16 Sup. Ct. 427, 40 L. Ed. 576, where it was sought to appropriate lands in order to fix and preserve the lines of battle at Gettysburg, the Supreme Court of the United States, by Mr. Justice Peckham, say:

> "No narrow view of the character of this proposed use should be taken. Its national character and importance, we think, are plain. The power to condemn for this purpose need not be plainly and unmistakably deduced from any one of the particularly specified powers. Any number of those powers may be grouped together, and an inference from them all may be drawn that the power claimed has been conferred. It is needless to enlarge upon the subject, and the determination is arrived at without hesitation that the use intended as set forth in the petition in this proceeding is of that public nature which comes within the constitutional power of Congress to provide for by the condemnation of land."

The breadth and spirit of that language sounds a keynote in the tendency of the courts to recognize a public, sentimental or æsthetic purpose as a basis for judicial action. In this manner have scenic wonders been protected and preserved against the vandalism and greed of private interests and natural beauty sites have been developed simply because of civic pride, public æsthetics, and patriotic sentiment. These localities are oftentimes improved by such artistic touches as tend to produce an effect both pleasing and satisfactory. Their influence is uplifting, as well as educational. They are designed to produce mental health. Their beneficial æsthetic effect is never questioned. They stimulate civic pride, cultivate to a high degree the æsthetic taste of those whose tastes are in process of formation, and in the end advance the public spirit of patriotism. Such an end justifies any proper and permissible means. When we attempt to apply these principles to the use of private property, however, or to such facts as are here disclosed, we are at a loss for precedent, although judicial tendency has been to some extent affected by the same spirit of æsthetics which has prompted the preservation and improvement of places of public interest.

In Pears v. Manhattan R. Co. (unreported), Judge Daly recognized and commented upon the disfigurement of the elevated railway stations by signs which sacrificed an effect designed to be architecturally pleasing. It may be doubtful whether the evil of unsightly advertisements could be effectually controlled save through a constitutional amendment. Fifth avenue, from Washington Square to Twelfth street, is devoted almost exclusively to residences. From Twelfth to Forty-Eighth street a large number of business houses of the higher class have crept in. From Forty-Eighth to Fifty-Ninth street it is devoted to churches, residences, clubs, and hotels, and north of Fifty-Ninth street, with practically no exceptions, the buildings are private dwellings. At Washington Square it enters a public park, and at Fifty-Ninth street it furnishes one of the principal entrances to Central Park, along which it extends from Fifty-Ninth to One Hundred and Tenth street. In the erection of buildings, whether for church, business, or residential purposes, architectural symmetry has been preserved to such a degree that the avenue has become a municipal landmark. Civic pride has prompted the pro-

tection of the thoroughfare from all unnecessary commercial use and traffic., And, although the mercantile invasion with its consequent disfigurement has tended to mar the picture, Fifth avenue has nevertheless maintained a general appearance of architectural superiority.   It is amid such scenes as this that the plaintiff's advertising panorama of brilliant signs moves.   It is along this avenue of churches that on Sunday these glaring billboards are driven.   It is this scheme of beauty which is sacrificed to the demands of modern commercialism.   It is along this entrance to parks and along the parks themselves, preserved to attract lovers of nature and of the beautiful, that these unnatural and inartistic moving picture signs are displayed.   But, out of place, disagreeable, and offensive though they are, both to civic pride and æsthetic taste, and although the tendency of equity jurisprudence is to extend the court's jurisdiction to include this situation, the ultimate fact remains that no authority now exists which will justify the legal conclusion that the plaintiff's signs constitute a nuisance.

Let us now consider whether the plaintiff has such a clear legal right as would authorize equitable protection.   In July, 1907, the defendant, through its police department, summoned the plaintiff's superintendent before a magistrate for violating section 41, c. 2, art. 4, pt. 2, of the Code of Ordinances of the City of New York, which reads:

"No advertising trucks, vans or wagons shall be allowed in the streets of the Borough of Manhattan, under a penalty of ten dollars for each offense. Nothing herein contained shall prevent the putting of business notices upon ordinary business wagons, so long as such wagons are engaged in the usual business or regular work of the owner and not used merely or mainly for advertising."

This ordinance resulted from the re-enactment, without substantial alteration, of prior ordinances in existence since 1882, and its adoption was authorized by section 50 of the Greater New York charter, which empowered the board of aldermen "to regulate the use of streets and sidewalks by foot passengers, animals or vehicles; to regulate the speed at which vehicles shall be driven or ridden and at which vehicles shall be propelled in the streets;  *  *  *   to regulate the exhibition of advertisements or handbills along the streets; and to make all such regulations in reference to the running of stages, omnibuses, trucks, and cars as may be necessary for the convenient use and the accommodation of the streets, piers, wharves, or stations."   The proceeding before the magistrate was dismissed upon a technicality and the parties remitted to a civil action.   Thereafter the plaintiff was notified by the corporation council that the exhibition of these exterior signs was unauthorized and illegal, and that they would be so treated by the various city departments.   Thereupon this action was commenced.   The plaintiff alleges the peculiar adaptability of the exterior of its automobile coaches for advertising; that the income received from the advertising company is $10,000 per annum, plus the sum of $200 per stage; that the defendant threatens and intends to prevent the maintenance of the exterior advertising signs; and that such interference is in derogation of its franchise and constitutional rights.   Upon those allegations it seeks equitable intervention.   The plaintiff secured temporary relief

under an order to show cause granted August 30, 1907, containing a preliminary injunction which to the present time has stood unchallenged.

The position taken by the defendant, aside from the question of nuisance, is (1) that the plaintiff is not authorized either by statute, by its charter, or by custom to engage in exterior advertising; (2) that the signs are violative of section 41, c. 2, art. 4, pt. 2, of the Code of Ordinances of the City of New York, passed to permit the valid exercise of police power vested in the defendant under its charter. The plaintiff contends (1) that the right to use the outside of its stages for carrying advertising matter is incidental to its right to transport passengers; (2) that the defendant's threatened interference is not a lawful exercise of police power; (3) that the ordinance does not include the plaintiff; (4) that, even though it does include the plaintiff, it could not be invoked for the reason that the plaintiff's franchise, having been granted by the Legislature, cannot be annulled or restricted by the defendant, and, the display of advertisements being merely an incident to the franchise, the defendant has no greater power to interfere with the incidental right than with the franchise itself; (5) that the adoption of the ordinance was unauthorized; (6) that the ordinance prevents the lawful use of private property; and (7) is unconstitutional.

The first question presented is whether the plaintiff is authorized either by law or under its charter to devote the exterior of its stages to advertising. In 1885 the Fifth Avenue Transportation Company, Limited, was incorporated for the following certified objects:

"To carry passengers and property for hire, in all kinds of vehicles drawn by horses, excepting tramcars; to establish, maintain, and operate stage or wagonette routes for public use in the conveyance of persons and property; to take and convey persons and property in stages or wagonettes, and to provide and run the necessary stages or wagonettes, or both upon its routes for the public use, and to receive compensation, therefor upon acquiring authority to establish, maintain, and operate such routes, and to keep on livery, and for its own use, and for hire for others to use, horses, harness and all kinds of vehicles drawn by horses, excepting tramcars; to deal in horses, and to manufacture and deal in harness and all kinds of vehicles drawn by horses, excepting tramcars, and all kinds of merchandise and commodities pertaining to or incidentally connected with or necessary and useful in the business aforesaid, or which can be made or dealt in profitably in connection with said business or any and all of its branches; to purchase, lease, hold, use, sublet, sell, and exchange all such real estate and other property as may be necessary or convenient for the establishment, maintenance and operation of its business, and the erection and maintenance of buildings and other accommodations necessary to fully accomplish the objects of its incorporation, including stables, blacksmith shops and farrieries in connection with such stables, and all necessary and useful buildings, fixtures and machinery for the accommodation for its passengers, freight and parcels."

In the succeeding year the Legislature passed chapter 536, p. 765, Laws 1886, entitled:

"An act to authorize the Fifth Avenue Transportation Company, Limited, or its assigns to run stages on Fifth avenue, through Washington Park and through South Fifth avenue to Bleecker street elevated railway station, in the city of New York, and return."

By "section 1" thereof it was enacted:

"That the Fifth Avenue Transportation Company, Limited, a company organized under the laws of the state of New York, and its assigns, be and they

are hereby authorized on payment of the license fees as hereinafter provided, to run and drive, or cause to be run and driven, and without further authority from said city, a line of stages, or carriages, for the transportation of passengers, for hire, from Eighty-Ninth street, in the city of New York, down Fifth avenue, across Washington Park and along South Fifth avenue to the Bleecker street elevated station and return, provided that the consent thereto in writing of a majority of the owners of the property on the avenue and streets wherein such stages or carriages are hereby authorized shall have been obtained and filed with the mayor of said city."

A consent in writing signed by the requisite number of property owners along the proposed route was duly filed, pursuant to section 1947, p. 473, c. 410, of "New York City Consolidation Act 1882." By chapter 182, p. 212, Laws 1889, it was enacted:

"That the Fifth Avenue Transportation Company, Limited, a corporation organized under the laws of the State of New York, and its assigns, be and are hereby authorized * * * to run, drive, or cause to be run or driven, and without further authority from said city, a line of stages or carriages for the transportation of passengers and parcels for hire."

· In February, 1895, in an action brought by the people of the state of New York against the Fifth Avenue Transportation Company, Limited, judgment was entered decreeing the dissolution of that company and a distribution of its property, and appointing a receiver for the latter purpose. Thereafter the receiver was authorized by an order of the court "to continue the running of the stage line of said corporation, and the vehicles for hire for passengers on special occasions, until the sale of the right to sell such stages and stage line be had, or until the further order of the court in the premises." In July, 1895, an order was entered which provided that all the rights conferred on the Fifth Avenue Transportation Company, Limited, by chapter 536, p. 765, of the Laws of 1886, and by chapter 182, p. 212, of the Laws of 1889, and all the other property of the corporation, be sold at public auction under the direction of the receiver. In October the receiver reported the sale of the property and rights to one Ward Campbell, and upon that report judgment of confirmation was entered. Thereafter a bill of sale was executed and delivered by the receiver, whereby he sold and conveyed to Ward Campbell, in addition to specified chattels, "all the right to run and drive, or cause to be run and driven, a line of stages or carriages for the transportation of passengers for hire from Eighty-Ninth street, in the city of New York, down Fifth avenue, across Washington Park and along South Fifth avenue to the Bleecker street elevated station and return, together with all the rights granted to Fifth Avenue Transportation Company, Limited, or acquired by it, under or by chapter 536 of the Laws of 1886, and all the rights granted to or acquired by said Fifth Avenue Transportation Company, Limited, under or by chapter 182 of the Laws of 1889." In July, 1896, the plaintiff, Fifth Avenue Coach Company, was incorporated, "to take and possess the property and franchises" of the Fifth Avenue Transportation Company, Limited, sold to Ward Campbell, and in November, 1897, the latter by bill of sale transferred to the plaintiff "all of said rights, licenses, privileges, franchises, and properties" which he acquired by purchase from the receiver of the Fifth Avenue Transportation Company. The plaintiff

thereby became vested with all the original rights, privileges, and franchises possessed by that company. Matter of Long Acre Elec. Light & Power Co., 188 N. Y. 361, 80 N. E. 1101.

A corporation is not a tangible being. It becomes a legal entity by statutory permission. It is a mere legislative fiction, a creature of the law existing only by virtue of legislative enactment. Its powers, like its corporate life, are derived from the Legislature, and the measure of its powers is found in the charter which gives it existence. Although strict construction has resulted in the formulation of the rule that only the powers granted may be exercised, the rigidity of that rule has been relaxed and the rule itself qualified by the application of a more modern principle, which recognizes not only the express powers, but those which attach as necessary incidents to, and which may reasonably be implied from the powers specifically conferred. But in the main the rule of strict construction prevails. Especially is this true in the case of public and quasi public corporations, of which latter class the plaintiff is a member. And the reason is plain. The powers and privileges of these corporations are conferred not for the private purposes of the corporations, but for public purposes and to promote public interests. They are granted at the public expense, since they bestow advantages not possessed by those not incorporated. The public benefit is compensation for the grant, and the grant is made in contemplation of that benefit. There is therefore a strong presumption that the Legislature, in conferring corporate powers, has carefully considered the interests of the public, and has granted only such powers as public interests require. When corporations are permitted to usurp and exercise powers not conferred, it is at the expense of the public. The demand, therefore, that they be kept within their chartered limits is dictated by public policy. Bissell v. Mich. S. & N. I. R. R. Co., 22 N. Y. 258. But the courts have recognized that certain incidental powers must necessarily attach to, or reasonably be implied from, the express grant, in order to enable a corporation to exercise the powers conferred and to accomplish the objects for which the corporation was created. So that the rule which now prevails is that corporations possess only such powers as are expressly granted by legislative enactment, together with such others as are necessarily or fairly implied in or are incidental to the powers thus granted or essential to the declared objects and purposes of the corporation. The only exception to this rule is furnished by private corporations, which may exercise many extraordinary powers, provided all its stockholders assent and none of its creditors are injured. Under those circumstances there is no one to complain except the state, and, the business being entirely private, the state does not interfere. Martin v. Niagara Falls, etc., Co., 122 N. Y. 165, 25 N. E. 303. The broadest enunciation of the rule is found in Brooklyn Heights R. R. Co. v. City of Brooklyn, 152 N. Y. 244, 250, 46 N. E. 509, 511, where the Court of Appeals, by Gray, J., say:

"When we speak of what a corporation may or may not do within its grant of powers, we have in mind the reasonable intendments of its charter, as well as its clear expressions of authority. We search, in a doubtful case of an exercise of power, not in terms conferred, for what may be deemed to be reasonably implied as a means of carrying out the powers specifically given

and so as to permit of the amplest exercise thereof, which is consistent with the object and purpose of the public grant. A railroad corporation is particularly called upon to consult the public convenience and what is done by it in that direction should be sustained, if support for the act is possible to be found in the law of its being. If a reasonable necessity exists, in a proper discharge of its duties to the public, for the act complained of, that should be a sufficient answer to the complaint."

This does not alter the general principle that public corporations possess only those powers which are necessary to the accomplishment of their limited and well defined objects. And, if this principle is important as a general rule of municipal law, it is of the highest importance in this state, where corporations have been extended and multiplied so as to embrace almost every object of human concern. Public corporations are created for certain limited and specific purposes. Therefore their general powers should be restricted by the declared objects of their institution, and their incidental powers should be extended only as a means of consummating these objects. An incidental power is defined to be one that is directly and immediately appropriate to the execution of the specific powers granted, and not one that has only a slight or remote relation thereto. An incidental power exists merely for the purpose of enabling a corporation to carry out the powers expressly conferred and to accomplish the purpose of its existence. It can never avail to enlarge the express powers, and thereby warrant the corporation to devote its efforts and its capital to purposes other than those which its charter expressly authorizes, or to engage in collateral enterprises not directly, but only remotely, connected with its specific corporate objects. An act, in order that the power to perform it may be implied, must tend directly and immediately, and not slightly or remotely, to accomplish the object for which the corporation was created. 7 Am. & Eng. Encyc. of Law, 700. Implied powers must result from the charter by necessary implication, regard being had to the purposes of the corporation, and, if there is any uncertainty or doubt as to the terms or intendment of the charter, it must be resolved against the corporation. Whether or not the implied powers of a corporation authorize it to engage in an undertaking or enterprise not directly related to the declared objects of the charter depends not upon the question whether the particular enterprise would have a tendency to increase the legitimate corporate business, but upon the question whether the exercise of such authority, in view of the circumstances, is reasonably necessary to the proper prosecution of that business. When the words used in the charter admit of different meanings one of which would abrogate, restrict, or abridge the independent rights, profits, or facilities of the public, the meaning most favorable to the public interests and most adverse to the corporation will be adopted, because the latter "in bargaining with the public" ought to be careful to express distinctly what is intended. Camblos v. Philadelphia & R. R. Co., Fed. Cas. No. 2,331. Corporations, however, from whatever cause, frequently overstep the well-defined boundaries of their charters within which their acts and undertakings should be confined and attempt the exercise of unauthorized powers. To this tendency is attributed the evolution of the doctrine of ultra vires. The term ultra

vires is the modern legal nomenclature for acts of a corporation through any of its instrumentalities which are beyond the powers conferred by law upon the legal entity. A corporation has no natural or inherent rights or capacity. Brought into being by legislative enactment, it has such powers as the state sees fit to give it—nothing more. When it assumes to act beyond those powers the assumption is void, the act a nullity and any resulting contract ultra vires. Perhaps the most general statement which can be made of the doctrine of ultra vires is to say that a contract of a corporation which is unauthorized by or in violation of its charter or other governing statute, or entirely outside the scope of the purposes of its creation, is void, "in the sense of being no contract at all because of a total want of power to enter into it." 10 Cyc. 1146. And in "France on Elements of Corporation Law" it is said that:

"The transaction may be beyond the powers of the corporation simply because it is foreign to the purposes expressed or implied in the charter. It may invoke the exercise of a power not forbidden, but simply ungranted, as, for example, where a railroad undertakes to guarantee the expenses of a public festival. In the better usage the term 'ultra vires' is limited to acts of the latter class, and many of the courts make a distinction between transactions which are illegal, because forbidden, and those which are simply in excess of the granted powers."

The illustration referred to by the author is based on the decision in Davis v. Old Colony R. R. Co., 131 Mass. 258, 41 Am. Rep. 221, where Chief Justice Gray, after a most elaborate examination and exhaustive analysis of more than fifty authorities, said:

"A corporation has power to do such business only as it is authorized by its act of incorporation to do, and no other. It is not held out by the government, nor by the stockholders, as authorized to make contracts which are beyond the purposes and scope of its charter. It is not vested with all the capacities of a natural person, or of an ordinary partnership, but with such only as its charter confers. If it exceeds its chartered powers, not only may the government take away its charter, but those who have subscribed to its stock may avoid any contract made by the corporation in clear excess of its powers. If it makes a contract manifestly beyond the powers conferred by its charter, and therefore unlawful, a court of chancery, on the application of a stockholder, will restrain the corporation from carrying out the contract; and a court of common law will sustain no action on the contract against the corporation. * * * The holding of a 'world's peace jubilee and international musical festival' is an enterprise wholly outside the objects for which a railroad corporation is established; and a contract to pay, or to guarantee the payment of, the expenses of such an enterprise, is neither a necessary nor an appropriate means of carrying on the business of the railroad corporation, is an application of its funds to an object unauthorized and impliedly prohibited by its charter, and is beyond its corporate powers. Such a contract cannot be held to bind the corporation. by reason of the supposed benefit which it may derive from an increase of passengers over its road, upon any grounds that would not hold it equally bound by a contract to partake in or to guarantee the success of any enterprise that might attract population or travel to any city or town upon or near its line."

In Bath Gaslight Co. v. Claffy, 151 N. Y. 24, 45 N. E. 390, 36 L. R. A. 664, the Court of Appeals, by Andrews, C. J., says:

"The modern doctrine, as stated by Chancellor Kent, is to consider corporations as having such powers as are specifically granted by the act of incorporation, or as are necessary for the purpose of carrying into effect the

powers expressly granted, and as not having any others.   2 Kent, Comm. 299. This doctrine is embodied in the Revised Statutes of New York, and the section relating to the subject is regarded simply as declaratory of the antecedent law.   1 Rev. St. [1st Ed.] p. 600, pt. 1, c. 18, tit. 3, § 3.   It has been frequently stated that the validity of contracts of corporations is to be determined by comparing the contract made with the charter, and, if upon such comparison it appears that the contract was neither expressly authorized, nor a necessary or reasonable incident to the exercise of the powers specifically granted, the contract is ultra vires."

In People ex rel. Tiffany & Co. v. Campbell, 144 N. Y. 166, 38 N. E. 990, the court, by Andrews, C. J., say:

"It is claimed that the purchase and sale of goods not manufactured by the relator, merely to complete its stock, and limited to articles which it could not advantageously manufacture itself, was incidental and subsidiary to the exercise of its corporate power as a manufacturing company, and therefore within the power granted.   It is well settled that a corporation possesses not only powers specifically granted in terms, but (as expressed in the Revised Statutes) such powers 'as shall be necessary to the exercise of the powers so enumerated and given.'   1 Rev. St. [1st Ed.] p. 600, pt. 1, c. 18, tit. 3, § 3. The unexpressed and incidental powers possessed by a corporation are not limited to such as are absolutely or indispensably necessary to enable it to exercise the powers specifically granted.   Whatever incidental powers are reasonably necessary to enable it to perform its corporate functions are implied from the powers affirmatively granted.   Comstock, J., Curtis v. Leavitt, 15 N. Y. 69.   But powers merely convenient or useful are not implied if they are not essential, having in view the nature and object of the incorporation. The power assumed by the relator in this case to supply from other sources goods which it could not itself profitably manufacture was a convenient and useful one, and doubtless contributed to the success of the general business, but it cannot, we think, be said to be essential to its business as a manufacturing corporation."

In Chapman v. Lynch, 156 N. Y. 551, 51 N. E. 275, a contract by a business corporation organized under the act of 1875, for the manufacture of salt, to receive money upon deposit for a special account, was held to be ultra vires.   In Schurr v. N. Y. & B. S. I. Co. (Com. Pl.) 18 N. Y. Supp. 454, Mr. Justice Pryor said:

"Upon the point of the competency of the defendant to make the contract, the argument of respondent is 'that, the object of the corporation being to improve, sell, and lease real estate, a contract with plaintiff to organize stock companies on its land so as to increase its value is certainly not ultra vires.' Notwithstanding the confidence with which the conclusion is announced, we are of the opinion that it is a non sequitur.   *   *   *   That authority to engage in the business of organizing other corporations is neither necessary nor incidental to the charter objects of the defendant company is a proposition too plain for plausible dispute.   No doubt the erection of factories on defendant's land would tend to enhance its value; but obviously not any and every thing that so tends is necessary or incidental to the charter objects of the corporation."

Section 10 of the general corporation law (Laws 1892, p. 1804, c. 687) reads in part:

"No corporation shall possess or exercise any corporate powers not given by law or not necessary to the exercise of the powers so given."

In Jacksonville, etc., R. & N. Co. v. Hooper, 160 U. S. 514, 16 Sup. Ct. 379, 40 L. Ed. 515, the Supreme Court of the United States say:

"To lease and maintain a summer hotel at the seaside terminus of a railroad might obviously increase the business of the company and the comfort of

its passengers, and be within the provisions of the statute of Florida above cited, whereby a railroad company is authorized 'to sell, lease, or buy any land or real estate not necessary to its use,' and to 'erect and maintain all convenient buildings * * * for the accommodation of their passengers.' Courts may well be astute in dealing with efforts of corporations to usurp powers not granted them, or to stretch their lawful franchises against the interests of the public. Nor would we be understood to hold that in a clear case of the exercise of a power forbidden by its charter, or contrary to public policy, a railroad company would be estopped to decline to be bound by its own act, even when fulfilled by the other contracting party. Davis v. Old Colony R. R. Co., 131 Mass. 258, 41 Am. Rep. 221; Thomas v. Railroad Co., 101 U. S. 71, 25 L. Ed. 950; Central Trans. Co. v. Pullman's Car Co., 139 U. S. 24, 11 Sup. Ct. 478, 35 L. Ed. 55. * * * We do not seek to relax, but rather to affirm, the rule laid down by this court in Central Transportation Co. v. Pullman's Car Co. (above cited) that 'a contract of a corporation, which is ultra vires in the proper sense—that is to say, outside the object of its creation as defined in the law of its organization, and therefore beyond the powers conferred upon it by the Legislature—is not voidable only, but wholly void, and of no legal effect. The objection to the contract is not merely that the corporation ought not to have made it, but that it could not make it.' Such a contract cannot be satisfied by either party, because it could not have been authorized by either. No performance on either side can give the unlawful contract any validity or be the foundation of any right of action upon it."

In Worden v. City of New Bedford, 131 Mass. 23, 41 Am. Rep. 185, the court says:

"But the defendant contends that a city or town has no power to let its public buildings for private uses; that the letting to the poultry association, if made by the city, was ultra vires, and therefore it is not liable. This ground is untenable. The city could not erect buildings for business or speculative purposes, but, having a city hall built in good faith and used for municipal purposes, it has the right to allow it to be used incidentally for other purposes, either gratuitously or for a compensation. Such a use is within its legal authority, and is common in most of our cities and towns. French v. Quincy, 3 Allen (Mass.) 9."

The courts of this state have modified the rule when applied to executed contracts (Whitney Arms Co. v. Barlow, 63 N. Y. 62, 20 Am. Rep. 504), and the modern interpretation is stated in Vought v. Eastern B. & L. Ass'n, 172 N. Y. 508, 511, 65 N. E. 496, 92 Am. St. Rep. 761. There has been no relaxation, however, of the principle. Although the courts are astute to prevent inequity when the rights of innocent parties dealing with a corporation are involved, they do not sanction the commission or the continuance of ultra vires acts. Public corporations, organized for public benefit, owing the public a duty in return for their franchises, are held within their powers by means of this salutary principle of ultra vires. The plaintiff is a quasi public corporation. It was chartered and is operated for the accommodation of the public, as well as for the benefit of its stockholders. It is privileged by franchise to make a specific use of the streets not common to others, and which may not be exercised except under state grant.

The powers granted by the charter under which the plaintiff acquired its existence are limited to the carriage of persons and property for hire. No claim is made that there is any express authority in the charter to engage in the business of exterior advertising. But it is contended that such authority impliedly exists as an incident to the

powers expressly granted.   The maintenance of exterior advertising signs is not necessary to the exercise of the plaintiff's corporate powers, or the performance of its corporate duties, or to the accomplishment of the objects and purposes of its incorporation.   On the contrary, it is an independent enterprise, entirely foreign to and disassociated from the plaintiff's chartered business.   It does not tend to promote the comfort or convenience of the passengers or effect any improvement in the traffic facilities.   Therefore the right to carry exterior signs is not in any manner incidental to the plaintiff's right to carry passengers.   With equal propriety could it be held that an advertising company could devote its delivery wagons to the purposes of a common carrier, or that a public corporation is authorized to engage in any business, however distant from that for which it was organized.  . I am referred to no decision supporting—and research has failed to disclose any authority for—the plaintiff's contention that exterior advertising on public conveyances is incidental to the exercise of the powers of common carriers.   The adjudicated cases have gone no further than to recognize and sanction the right of certain railroad corporations to display advertising signs in their stations or to establish an enterprise which, while not directly authorized by the charter, promoted the comfort and convenience of passengers, thereby contributing to the legitimate corporate business, merely because the exercise of these added privileges had become established by custom.   Thus in City of New York v. Interborough R. T. Co., 53 Misc. Rep. 126, 104 N. Y. Supp. 157, the right of the Subway Company to rent space for advertising signs and weighing machines in the subway stations was challenged.   A preliminary injunction was granted (47 Misc. Rep. 221, 95 N. Y. Supp. 886), which, after trial, was made permanent upon the ground that the right to maintain news stands, vending and weighing machines, and advertising signs in stations is, as an incident to the operation of railways, based upon a practically universal custom.   To the same general effect are Flanagan v. Great Western R. Co., L. R. (7 Eq.) 116, and Holmes v. Eastern Counties R. R. Co., 3 K. & J. 675.

But in this case no custom has been established in support of the plaintiff's alleged right to carry signs on the outside of its stages.   Some evidence was adduced that between the years 1850 and 1854 small signs were displayed upon stages operated in Grand street advertising places of amusement and commercial houses in or near the vicinity of the stage route; that advertising is permitted in the subway stations and on the platforms of elevated railroad stations and upon and under the stairways leading thereto; that on certain horse-propelled cars small advertising flags are displayed, and that placards relating to points of public interest are affixed to the dashboards of a few trolley cars; that prior to the installation of the present automobile stages the horse-drawn stages operated by the plaintiff bore signs advertising theaters and other points of interest along the route.   That evidence does not establish the custom for which the plaintiff contends.   It does not show that the exterior of the elevated cars, the subway cars, or the street cars is utilized for the display of advertising signs, but proves the contrary.   In Pears v. Man. Ry. Co., N. Y. L. J. (February 3, 1900),

where the right of the railway company to permit signs to be placed on the exterior of the stations and towers of the elevated railroad was in issue, it was held that the company had no power under its charter either to engage directly in the advertising business or to do so indirectly by leasing its structures for posters and advertisements which had no connection with the business of the company or the convenience of passengers; furthermore, that the stations of the railway company were built upon the public streets of the city, the use of which had been granted to the company for certain specific purposes, and that the maintenance of advertising signs was an attempted use of the public streets for a private purpose not authorized by law. In Pittsburg & Birmingham Traction Co. v. Seidell, 6 Pa. Dist. R. 414, the right of a public corporation to engage in advertising and to carry signs upon and in its cars was considered, and the right for which the plaintiff here contends was ruled against in this language:

"The plaintiff has not only the right to carry passengers, but it also has a right to do anything necessary for the convenient carrying out of the purposes for which it was chartered, and whatever is fairly incidental thereto. * * * We are unable to see why the business of advertising for pay comes within any of the rules given as to the power of such corporation. It is not necessary for carrying out any of the powers or purposes for which these corporations were chartered, nor is it incidental thereto. It is not conducive to the comfort or safety of the passengers or to their convenience, any more than would be printing a newspaper or opening a banking business."

There is no analogy between the present case and that of New York Mail & Newspaper Trans. Co. v. Shea, 30 App. Div. 266, 51 N. Y. Supp. 563. There the trustees of the Brooklyn Bridge were permitted to use the bridge, public property, to install pneumatic tubes along the structure, in accordance with a practice which the Legislature had sanctioned. Laws 1887, p. 735, c. 563. The plaintiff was incorporated to serve the public as a common carrier for hire. It is authorized to use the public streets for that specific public purpose. The leasing of the exterior of its vehicles for advertising is an unauthorized use of the streets for a private purpose. Such a special and peculiar use has been condemned even after it has received the stamp of municipal approval. Hatfield v. Straus, 189 N. Y. 208, 83 N. E. 172; State ex rel. Belt v. City of St. Louis, 161 Mo. 371, 61 S. W. 658. The use of the exterior of the stages is not a stage use; it is not in furtherance of the corporate objects; it is not necessary to the performance of any corporate duty; it is not an element in the consummation of any purpose for which the corporation was formed; it is a distinct and separate enterprise unrelated to the duties and objects of the plaintiff as a common carrier. The cases cited by the plaintiff (French v. Quincy, supra; Spaulding v. Lowell, 23 Pick. [Mass.] 71; Worden v. City of New Bedford, supra; Bell v. Platteville, 71 Wis. 139, 36 N. W. 831; Flanagan v. Great Western R. Co., supra; Holmes v. Eastern Counties R. R. Co., supra; Brown v. Winnisimmet Co., 11 Allen [Mass.] 326; Forrest v. Manchester R. Co., 30 Beav. 40) outline principles with which I am in full accord, but they are not authorities for the plaintiff's contention.

The fact that the plaintiff receives a substantial income from the advertising company is without weight. The court will not approve an unauthorized act merely because it is a source of profit to the wrongdoer. It is true, as the plaintiff argues, that the owner of property has the right to use it without restraint, provided the property, health, physical comfort and morals of others and of the public are not injured by such use. But that principle does not apply to public corporations using the streets for a specific purpose under a limited franchise granted by the state. It is likewise true that the plaintiff's charter cannot be annulled or restricted by the defendant, and that the defendant has no power to interfere with any right which is incidental to the charter; but that principle is also inapplicable in view of the fact that the maintenance of the plaintiff's signs is not an incident to its franchise.

The plaintiff challenges the power of the board of aldermen to pass the ordinance under which the defendant asserts its right to remove the advertising signs. Section 50 of the Greater New York charter empowers that board "to regulate the use of streets and sidewalks by foot passengers, animals, and vehicles," as well as "the exhibition of advertisements or handbills along the streets," and to "make, establish, alter, modify, amend, and repeal all ordinances" necessary to that end. The power thus conferred is sufficient authority for the adoption of the ordinance. The plaintiff argues that the power to regulate does not include the power to prohibit, and cites Peace v. McAdoo, 110 App. Div., 13, 96 N. Y. Supp. 1039. That case, however, arose under section 315 of the charter, which empowered the police department to "regulate the movement of teams and vehicles in streets, bridges, squares, parks and public places"; and the court said:

"The very idea of a street imports the right of the general public to pass and repass thereon throughout all parts thereof. In People v. Kerr, 27 N. Y. 188, 194, the court says: 'The right of the public—that is, of the people of the state—in a street or highway, is a right of passage. In the ordinary use of the highway, it is a right to pass and repass over its surface on foot or in carriages at pleasure.' In Smith v. McDowell, 148 Ill. 51, 35 N. E. 141, 22 L. R. A. 393, it is said: 'The municipality in respect of its streets is a trustee for the general public and holds them for the use to which they are dedicated. The fundamental idea of a street is not only that it is public, but that it is public in all its parts for free and unobstructed passage thereon by all persons desiring to use it.' * * * The right of regulation is restricted to the 'movement of teams and vehicles in streets,' etc. This expression recognizes the existence of such a thing, and such a movement in every part of a street is a public right. If, under the guise of a regulation, that movement is forbidden in any part of a street, there is, of course, an impairment of the right—a pro tanto prohibition against its exercise."

Here the plaintiff is attempting to exercise unauthorized privileges not common to the public, and the ordinance does not, therefore, impair any right. Furthermore, there is a wide distinction between the power given to the police department to regulate traffic and that granted to the board of aldermen to regulate the use of the streets. The ordinance is constitutional. As I have shown, no right exists in the plaintiff to engage in exterior advertising, and the contracts having that object in view are ultra vires. Therefore any ordinance designed to prevent the display of the plaintiff's signs could not be held to de-

prive it of its property without due process of law, or to deprive it of
the equal protection of the laws within the meaning of the fourteenth
amendment of the Constitution of the United States, or to impair the
obligation of its contracts. The discrimination which the plaintiff
claims is effected by this conclusion has no existence in fact. There is
not·a scintilla of evidence that any common carrier anywhere enjoys
the privilege of displaying on the outside of its vehicles signs similar
to those carried by the plaintiff's stages or even approaching them in
similarity. The ordinance is broad, and bears equally upon all public
and quasi public corporations. But the plaintiff maintains that its
vehicles are not "advertising trucks, vans, or wagons." If it were nec-
essary to decide that question, I would be inclined to the conclusion
that the term "wagon" contained in the ordinance embraces the plain-
tiff's stages. It has been held that the word "wagon" is a generic term,
including every other species of vehicle, by whatever name they may
be called. Gordon v. Shields, 7 Kan. 320, 325; Luce v. Hassam, 76 Vt.
450, 58 Atl. 725. But this case must be disposed of upon broader
grounds, which defeat the right of the plaintiff to any equitable relief.
The plaintiff has assumed the burden of establishing the existence of
facts which justify protective intervention by the court. It has not only
failed to sustain that burden, but has shown itself to be engaged in the
commission of acts unauthorized by law. Under these circumstances,
it asks that its illegal acts be not only approved, but perpetuated by ju-
dicial sanction against possible future lawful interference. Equity will
not stay the hand of the law under such circumstances. It follows that
the complaint must be dismissed on the merits.

The defendants will combine the proposed findings and conclusions
which have been approved, together with those which have been pre-
pared to support the ground upon which the disposition of the case is
based, and present a new decision for signature. Judgment accord-
ingly.